STATE OF NEBRASKA, APPELLEE, V.
MICHAEL T. GEORGE, APPELLANT.
645 N.W.2d 777

Filed June 7, 2002.    No. S-01-415.

David T. Schroeder, of Kelly & Schroeder, for appellant.

Don Stenberg, Attorney General, and Martin W. Swanson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

HENDRY, C.J.

## INTRODUCTION

Michael T. George brought a motion for postconviction relief pursuant to Neb. Rev. Stat. § 29-3001 (Reissue 1995), alleging that his convictions in 1993 for robbery and use of a weapon to commit a felony and his convictions in 1996 for first degree assault and use of a weapon to commit a felony were obtained in violation of his constitutional rights. After an evidentiary hearing, the district court denied George relief. George appeals.

## FACTUAL BACKGROUND

On March 28, 1993, Tessa Taylor was working at Coffin's Corner convenience store in Hall County, Nebraska. While talking with a customer, William Ostrander, Taylor saw a man standing at the door to the store. The man pulled up his shirt, covering the bottom part of his face to the tip of his nose. Taylor was able to see the man's entire face briefly before he pulled up his shirt. The man then walked in and stabbed Ostrander in the stomach with a knife.

After a brief scuffle with Ostrander, the assailant approached the cash register. He attempted to open the register by banging on it with his knife. Eventually, he pointed the knife at Taylor and ordered her to open the cash register. Taylor could see the man, and the exposed part of his face, throughout the incident. She was approximately 1 to 2 feet away from him when she opened the cash register. After she opened the register, the man took approximately $200 in cash and left. Taylor called the police.

Ostrander was taken to the hospital where he underwent surgery to repair serious internal wounds caused by the stabbing.

Ostrander remained in the hospital for 1 week, but recovered from his injuries.

Taylor described the assailant to the investigating officers as a man approximately 5 feet 10 inches tall, with shoulder-length dark hair with a lot of gray, wearing blue jeans and a blue shirt. Ostrander later provided a similar description of the assailant to the officers. The police showed Taylor three photographic line-ups consisting of six photographs each. Taylor picked out a photograph of George, which was included in one of the lineups, and stated that the photograph looked like the robber, but she would have to see a more recent photograph to be sure. The photograph of George was approximately 1 year old. Ostrander was also shown the same three lineups at the hospital, but was unable to conclusively identify anyone. He did, however, identify the photograph of an individual other than George as a " 'guy that looked something like the one that did it.' "

About 2 weeks after the incident, George came into Coffin's Corner to purchase cigarettes. Taylor was working at the time and recognized George as the assailant from March 28, 1993. Although frightened, Taylor looked at him carefully, memorized his license plate number, and called the police immediately after George left the store. The police thereafter arrested George and took a Polaroid photograph of him in his "street clothes." The "street clothes" George was wearing in this Polaroid photograph were similar to the clothing worn by the assailant during the stabbing and robbery.

The officers then showed a fourth photographic lineup separately to Taylor and Ostrander, which included the Polaroid photograph of George in "street clothes." The lineup consisted of six photographs, George's being the only Polaroid. Taylor identified George from this fourth lineup. Ostrander also picked out George's photograph from the fourth lineup, but was not completely certain in his identification.

George was charged with attempted second degree murder, a Class II felony, use of a weapon to commit attempted murder, robbery, and use of a weapon to commit the robbery. George's trial counsel was Jerry Fogarty.

At trial, Taylor testified she recognized George when he came into Coffin's Corner 2 weeks after the incident as the man who

stabbed Ostrander and robbed the store, and she identified him in court. Taylor stated she was positive George was the assailant, recognizing, among other things, his eyes and hair. Ostrander also made an in-court identification of George as the assailant, but acknowledged that he was not "100 percent sure." Finally, Taylor and Ostrander testified regarding the four photographic lineups and their respective identifications resulting from that procedure.

The jury was instructed on the elements of attempted second degree murder and "attempted manslaughter." The jury was also instructed, inter alia, on the elements of robbery and the elements related to the two weapons charges. The jury found George guilty of robbery, attempted manslaughter, use of a weapon to commit a robbery, and use of a weapon to commit attempted second degree murder. George was sentenced to a term of 16 years 8 months' to 50 years' imprisonment on the robbery charge, along with three additional consecutive sentences of 6 years 8 months' to 20 years' imprisonment for the remaining three convictions.

George appealed his convictions, asserting that (1) the conviction for attempted manslaughter was invalid in that attempted manslaughter was not a lesser-included offense of attempted second degree murder, (2) the conviction for use of a weapon to commit attempted second degree murder was invalid because he had been acquitted of attempted second degree murder, and (3) the sentences imposed were excessive. George's counsel on appeal was Harry Moore. In *State v. George*, 3 Neb. App. 354, 358, 527 N.W.2d 638, 642 (1995) (*George I*), the Nebraska Court of Appeals reversed George's conviction for attempted manslaughter, stating:

> The combination of the elements of the crime of criminal attempt with the elements of involuntary manslaughter creates a peculiar animal. The trial court instructed the jury that "[t]he elements of Attempted Manslaughter are: 1. That the defendant . . . engaged in conduct which constituted a substantial step to culminate in his commission of the crime of attempted manslaughter. 2. That he attempted to kill another without malice . . . unintentionally while in the commission of an unlawful act." A person cannot perform the same act intentionally and unintentionally at the same time. This instruction is a contradiction because a person

cannot intentionally take a substantial step toward the commission of a crime when that crime is an unintentional crime. Thus, attempted manslaughter does not and cannot exist under current Nebraska law.

The court also determined that because George had been acquitted of attempted second degree murder, the conviction for use of a weapon to commit attempted second degree murder must also be reversed.

The court went on to note that

this court cannot remand this cause for a retrial on the charge of attempted second degree murder or the use of a weapon to commit the underlying felony when the jury has already found George not guilty of attempted second degree murder. Furthermore, we cannot remand this cause for a retrial on the charge of attempted manslaughter because it does not statutorily exist. Therefore, we hereby reverse George's convictions under counts II and IV and vacate the sentences imposed for those convictions.

*Id.* at 361-62, 527 N.W.2d 643-44. George's convictions for robbery and use of a weapon to commit the felony of robbery were affirmed.

In 1996, Hall County Prosecutor Mark Young filed an information charging George with first degree assault, a Class III felony, and use of a weapon to commit first degree assault regarding the stabbing of Ostrander. George's trial counsel at the second trial was James Truell. Virtually the same evidence was adduced by the State at the second trial. Taylor again identified George in court as the robber. She stated that she was positive George was the person who attacked Ostrander and that she had recognized George when he came into the store 2 weeks after the incident. Ostrander identified George in court at the second trial as well, but again stated he was not "a hundred percent sure." Both Taylor and Ostrander again related to the jury the circumstances surrounding the four photographic lineups and their identifications as a result. George was found guilty of both charges and sentenced to two consecutive sentences of 6 years 8 months' to 20 years' imprisonment.

George appealed his convictions, asserting the trial court erred in (1) overruling George's motion to dismiss because there

was no credible eyewitness testimony produced by the State; (2) overruling George's motion to remove defense counsel; (3) receiving into evidence, over George's relevancy objection, the fourth photographic lineup; and (4) imposing excessive sentences. George's appellate counsel in his second appeal was Charles Maser. In a memorandum opinion, the Court of Appeals found all of George's claimed errors to be without merit and affirmed George's convictions and sentences. *State v. George*, 5 Neb. App. xxvii (No. A-96-861, Apr. 29, 1997) (*George II*).

On February 2, 2000, George filed a postconviction motion pursuant to § 29-3001, seeking to vacate his convictions for robbery and use of a weapon to commit robbery in *George I*, and first degree assault and use of a weapon to commit first degree assault in *George II*. George alleged, among other things, that he had received ineffective assistance of appellate and trial counsel during both his first and second trials. The court granted George's request for an evidentiary hearing and appointed counsel for George.

Postconviction counsel asserted that George received ineffective assistance of appellate counsel in *George I* and *George II*. Postconviction counsel alleged, inter alia, that appellate counsel in *George II* was ineffective in failing to raise on appeal trial counsel's failure to assert at trial the issue of prosecutorial vindictiveness. Postconviction counsel also alleged that appellate counsel in both *George I* and *George II* were ineffective in failing to raise on appeal trial counsels' failure to attempt suppression of the eyewitness identification evidence and trial counsels' failure to request an instruction regarding eyewitness testimony. Lastly, postconviction counsel alleged that the State had failed to disclose material evidence favorable to George in both *George I* and *George II*.

George also filed a motion in the postconviction proceedings requesting that the court authorize the appointment of an expert witness to testify on George's behalf regarding the reliability of eyewitness identification. The court denied the motion.

At the evidentiary hearing, Young testified that the decision to prosecute George for first degree assault and use of a weapon to commit first degree assault in *George II* was not made in retaliation for George's successful appeal in *George I*. He stated:

I think I talked to both [Ostrander and Taylor] before the appellate court decision came out, warning them that I thought there was a strong likelihood that the Court of Appeals would find that the [attempted manslaughter] conviction was a nullity. And I discussed that with them so they wouldn't be surprised . . . .

After the reversal, I went back and visited with both of them to get their input. . . .

. . . They both indicated their willingness and belief that it was appropriate to undertake a second trial, and that entered somewhat into my decision-making process.

Q. So the victims expressed to you some sort of feeling that if the case stayed where it was at after the appeal, that justice would not have been served?

A. Yeah, yeah. Mr. Ostrander in particular strongly expressed that opinion to me.

Q. And did you consider those opinions when making the decision or the recommendation to file the charge of first degree assault and use of a weapon?

A. I did.

Q. Was there any thought when the decision was made to file the — this new charges [sic], was there any thought or discussion that needed to be done to discourage Mr. George or others from filing — from exercising their right to appeal —

A. No.

Q. — convictions?

A. No.

Q. Did that play any part in your decision or your recommendation?

A. None whatsoever.

Young also testified that shortly after the opinion was released in *George I*, he discussed the situation with his superior and believed that "there was some indication in the opinion that Mr. George could be retried on the crime of first-degree assault [because] first-degree assault was not a lesser included [offense] of attempted murder."

Trial counsel in *George I*, Fogarty, testified. He stated that he did not raise any issues concerning the photographic lineups

because "I don't think we had a strong case in that regard." Regarding the State's alleged failure to disclose exculpatory information, Fogarty testified, "I'm not really certain about any of this, since it's been so long, but . . . these documents here I've put out, Exhibits 28, 47, 46, and 36, are the ones that are I can't say for sure were [disclosed]." These exhibits consisted of investigative police reports attempting to ascertain whether any of George's acquaintances could verify his whereabouts on March 28, 1993. Fogarty also stated, "I'm not sure whether they were provided or not. They don't seem familiar to me at the present time. Some of the information was provided to me by other means."

Trial counsel in *George II*, Truell, also testified. He stated that he did not raise the issue of prosecutorial vindictiveness at trial because he did not believe the issue had any merit. Truell further testified that after he had read the transcript of the first trial, and in particular the witnesses' in-court identifications of George, he elected not to raise any issues concerning whether the photographic lineups were unduly suggestive. Regarding the State's alleged failure to disclose exculpatory evidence, Truell testified, "I don't recall seeing [exhibits] 34, 36, 39, 41, 44, 46, 47, 28, 30, and 31."

Finally, appellate counsel in *George II*, Maser, testified. He stated that he did not raise the issue of prosecutorial vindictiveness on appeal because he "didn't believe it applied . . . I didn't see any evidence from the record that there was any vindictiveness on the part of the State."

The district court denied George's motion for postconviction relief. The district court determined in its order that prosecutorial vindictiveness "is **not** presumed in this case since the charges in the second complaint and information are not more serious than those contained in the original complaint and information filed against the defendant." The court also concluded that George "failed to present proof of actual vindictiveness on the part of the prosecution" regarding the filing of charges in *George II*. The court further found that the photograph of George contained in the fourth photographic lineup "was not unduly suggestive" and that based on *State v. Sanders*, 235 Neb. 183, 455 N.W.2d 108 (1990), the juries in

both trials "were properly instructed on the evaluation of witness credibility."

Finally, the court concluded that George had failed to prove his assertion that the State did not disclose material evidence favorable to George during either the first or second trial. The court noted that "Fogarty did not recall seeing the actual exhibits but did recall being aware of the information contained therein." In addition, the court stated that "[a]lthough Truell testified he did not recall receiving the [police reports], Truell was not asked whether the prosecution had disclosed the contents of said [police] reports to him." The court found that the testimony of Fogarty and Truell did not show that prosecutors had failed to disclose the information contained in the exhibits. The court also found that the information contained in the police reports referenced by Fogarty and Truell contained merely "suspicions, speculations, and rumors," which did not constitute material evidence favorable to George. George appealed, and we moved this case to our docket pursuant to our authority to regulate the caseloads of this court and the Court of Appeals. Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

## ASSIGNMENTS OF ERROR

George asserts, rephrased and renumbered, that the district court erred in failing to find ineffective assistance of appellate counsel in that the court erroneously found (1) there was no presumption of prosecutorial vindictiveness in *George II*, (2) there was no actual prosecutorial vindictiveness in *George II*, (3) the photographic lineups admitted in *George I* and *George II* were not unduly suggestive, and (4) a jury instruction concerning the reliability of eyewitness evidence was not required in either *George I* or *George II*. George further asserts the district court erred in (5) finding that the prosecution in *George I* and *George II* did not fail to disclose material evidence favorable to George and (6) overruling George's motion made during postconviction proceedings to hire an expert witness.

## STANDARD OF REVIEW

A criminal defendant requesting postconviction relief must establish the basis for such relief, and the findings of the

district court will not be disturbed unless they are clearly erroneous. *State v. Hunt*, 262 Neb. 648, 634 N.W.2d 475 (2001); *State v. Caddy*, 262 Neb. 38, 628 N.W.2d 251 (2001).

■ When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *Id.*

■ The denial of a motion to appoint an expert witness in a postconviction action is reviewed for abuse of discretion. *State v. Gagliano*, 231 Neb. 911, 438 N.W.2d 783 (1989); *State v. Suggett*, 200 Neb. 693, 264 N.W.2d 876 (1978).

## ANALYSIS

■ At the outset, we recognize that because George had different counsel at trial and on appeal in *George I* and *George II*, issues not raised on direct appeal regarding the ineffective assistance of trial counsel are waived. See *Caddy, supra.* A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal. *Id.* However, George is asserting the alleged ineffective assistance of appellate counsel in *George I* and *George II*, in failing to raise on appeal the issue of ineffective assistance provided by the respective trial counsels below. This postconviction action is George's first opportunity to raise any alleged ineffective assistance provided by appellate counsel regarding both direct appeals. We therefore address the merits of George's assignments of error.

### PROSECUTORIAL VINDICTIVENESS

George asserts in his first assignment of error that under *Blackledge v. Perry*, 417 U.S. 21, 94 S. Ct. 2098, 40 L. Ed. 2d 628 (1974), the district court erred in finding no presumption of prosecutorial vindictiveness in the filing of charges in *George II*. Whether George is entitled to a presumption of vindictiveness pursuant to *Blackledge* presents a question of law. When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *Hunt, supra.*

In *Blackledge*, the defendant was charged with misdemeanor assault in a prison administrative proceeding. He was found guilty and appealed his conviction. While that case was on appeal, the prosecutor indicted the defendant for felony assault. The defendant pled guilty to felony assault, but then appealed, asserting that

the felony charge was the result of prosecutorial vindictiveness and thus a violation of the defendant's constitutional rights.

■ The Court held that the defendant had a due process right under the 14th Amendment to the U.S. Constitution to pursue his initial appeal of the misdemeanor conviction "without apprehension that the State will retaliate by substituting a more serious charge for the original one, thus subjecting him to a significantly increased potential period of incarceration." 417 U.S. at 28. The Court also noted that "the Due Process Clause is not offended by all possibilities of increased punishment upon retrial after appeal, but only by those that pose a realistic likelihood of 'vindictiveness.'" 417 U.S. at 27. The Court found that the facts in *Blackledge* gave rise to a presumption of prosecutorial vindictiveness because the defendant was charged with a more serious offense after pursuing an appeal. The Court further determined that the state failed to rebut this presumption, and reversed the felony conviction. *Id.*

In *George I*, George was first charged with attempted second degree murder, a Class II felony. In *George II*, he was charged with first degree assault, a Class III felony. He was not charged with a more severe crime in *George II*.

George, however, argues that we should compare the severity of "attempted manslaughter" with the severity of first degree assault. Because there is no crime of "attempted manslaughter" in Nebraska, it is not possible to make such a comparison. Under *Blackledge*, it is the "charge" in the first trial which is compared with the "charge" in the second trial. 417 U.S. at 28. See, also, *U.S. v. Rodgers*, 18 F.3d 1425 (8th Cir. 1994). George was never charged with attempted manslaughter, nor, under Nebraska law, could he have been charged with such a crime. There is no presumption of vindictiveness in this case. This assignment of error is without merit.

George asserts in his second assignment of error that even without the benefit of a presumption of vindictiveness, the district court erred in failing to find actual prosecutorial vindictiveness and, accordingly, that appellate counsel was not ineffective in failing to raise the issue in *George II*. See, *United States v. Goodwin*, 457 U.S. 368, 384, 102 S. Ct. 2485, 73 L. Ed. 2d 74 (1982) ("[i]n declining to apply a presumption of vindictiveness, we of course

do not foreclose the possibility that a defendant in an appropriate case might prove objectively that the prosecutor's charging decision was motivated by a desire to punish"); *Rodgers, supra* (defendant may demonstrate prosecutorial vindictiveness by proving through objective evidence that prosecutor's decision was intended to punish defendant for exercise of legal right, or by showing that circumstances of case give rise to presumption of vindictiveness).

In order to establish a right to postconviction relief based on a claim of ineffective counsel, the defendant has the burden first to show that counsel's performance was deficient; that is, counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area. *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). See, also, *State v. Thomas,* 262 Neb. 138, 629 N.W.2d 503 (2001). Next, the defendant must show that counsel's deficient performance prejudiced the defense in his or her case. *Id.* The two prongs of this test, deficient performance and prejudice, may be addressed in either order. If it is more appropriate to dispose of an ineffectiveness claim due to the lack of sufficient prejudice, that course should be followed. *Id.* The entire ineffectiveness analysis is viewed with a strong presumption that counsel's actions were reasonable and that even if found unreasonable, the error justifies setting aside the judgment only if there was prejudice. *Id.* In order to show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *State v. Becerra,* 261 Neb. 596, 624 N.W.2d 21 (2001).

Young testified that his motivation for filing the charges in *George II* was Taylor and Ostrander's desire that George be held accountable for the stabbing of Ostrander. There is no indication in the record that Young's actions were motivated by a desire to punish George for exercising his right to appeal the decision in *George I.* The district court found no prosecutorial vindictiveness in *George II,* and our review of the record shows that this finding is not clearly erroneous. See *State v. Hunt,* 262 Neb. 648, 634 N.W.2d 475 (2001). Because there was no prosecutorial vindictiveness, George cannot show any prejudice which resulted from

Maser's failure to raise this issue on direct appeal. This assignment of error is also without merit.

### Photographic Lineup

George asserts in his third assignment of error that he received ineffective assistance of counsel in that his appellate counsel in both direct appeals failed to raise the issue of whether the eyewitness identifications from the photographic lineups were based on unduly suggestive lineups and should have been suppressed. George's argument regarding this assignment of error is that the "Polaroid picture of the defendant contained in [the fourth photographic lineup] is unduly suggestive because the other photos appear to be 35mm photos and the defendant is the only one wearing clothes matching the description given by the eyewitness." Brief for appellant at 19.

Even assuming for purposes of argument that the fourth photographic lineup was unduly suggestive, George has failed to show that he suffered any prejudice. The U.S. Supreme Court in *Strickland*, 466 U.S. at 695-96, stated:

> [A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. . . . [A] court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

See, also, *State v. Buckman*, 259 Neb. 924, 613 N.W.2d 463 (2000).

The record shows that Taylor identified George prior to viewing the fourth lineup. She testified at both trials that she recognized George as the assailant 2 weeks after the incident when he came into the store to buy cigarettes. She was "positive" it was him, because she recognized his eyes and hair, among other things.

Regarding her identification of George in the convenience store, Taylor testified at trial in *George I*:

> He came in and he wanted a carton of cigarettes. Where I was at the time was close to the cigarettes so I grabbed them off there and that's when I seen him. And my heart started beating really fast and I got really shaky and I couldn't

breathe. So I got a very good description of him and waited until he left the store and then said something to my sister that that was him. . . .

[Young:] Is the same person you saw on that afternoon in April the same person you saw the night of March 28 when you were robbed?

A. Yes, it is.

Q. Is that person in the courtroom today?

A. Yes, he is.

Q. Would you point him out and describe what he's wearing?

A. This man over here. He has a blue tie with a — like a gray shirt.

[Young]: Your Honor, may the record reflect the witness has identified the defendant?

[The Court]: It will so reflect.

Q. Are you absolutely sure that's the man who robbed you?

A. Yes, I am positive.

In *George II*, Taylor similarly testified at trial:

[Young:] When you saw the person who asked for the cigarettes, what did you know [sic]?

A I kept it to myself, but after he had left the store I told them that that was the man who robbed me.

Q Did you know that as soon as you saw him?

A Yes, I did.

Q Is there any doubt in your mind that that was the man who robbed you?

A No, there is not.

Q Is the man that you saw on March 28th and then again on April 16th here today?

A Yes, he is.

Q Could you point him out and describe what he's wearing?

A He's the defendant. He's wearing a light blue shirt and a tie with blue and brown in it.

[Young]: Your Honor, may the record reflect the witness has identified the defendant?

[The Court]: The record will reflect that the witness has identified the defendant.

. . . .

Q What was your physical reaction when you saw him in [the convenience store]?

. . . .

A I got very shaky and I was having a hard time like breathing. I was just kind of — I was scared, but I didn't want to like — I don't know how to describe it.

Taylor was not shown the fourth photographic lineup until after she had already recognized George as the assailant upon seeing him when he entered the store 2 weeks after the initial incident. Given the facts of this case, George has failed to show a reasonable probability that the outcome of either *George I* or *George II* would have been different had the fourth photographic lineup, or identifications related to the fourth photographic lineup by Taylor or Ostrander, been suppressed. The district court's finding that there was no ineffective assistance of counsel is not clearly erroneous. This assignment of error is without merit.

### EYEWITNESS INSTRUCTION

In his fourth assignment of error, George claims he received ineffective assistance of appellate counsel in both direct appeals when appellate counsel failed to assert that trial counsel should have requested a specific jury instruction concerning the reliability of eyewitness evidence. George argues the jury instructions at both trials were flawed in that "the trial court's instructions did not highlight the problems with eyewitness identification, the sole basis for conviction was eyewitness identification, [and] there is the possibility of misidentification." Brief for appellant at 21.

A similar claim was raised in *State v. Sanders*, 235 Neb. 183, 455 N.W.2d 108 (1990), in the context of a postconviction action. In *Sanders*, we held:

[I]t is the jury's function to determine the credibility of the eyewitness. Sanders' jury was instructed on credibility, the State's burden of proof, and the substantive elements of the crimes involved. These instructions allowed the jury to properly evaluate the credibility of the witnesses' identification testimony. . . . Therefore, Sanders' attorney was not

deficient in failing to request such a jury instruction [on eyewitness evidence reliability].

(Citations omitted.) 235 Neb. at 194, 455 N.W.2d at 116.

As in *Sanders*, the record here shows that in both trials, the jury was instructed on credibility, the State's burden of proof, and the substantive elements of the crimes for which George was convicted. The district court's finding that there was no ineffective assistance of counsel on this issue is not clearly erroneous. This assignment of error is without merit.

### Brady Violation

■ George contends in his fifth assignment of error that the district court erred in finding that the prosecution in *George I* and *George II* did not fail to disclose material evidence favorable to George. In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."

In its order, the district court found trial counsels' testimony, that they did not recall seeing certain exhibits, insufficient to show that the information contained in the exhibits was not disclosed. Fogarty, trial counsel in *George I*, testified that he was not sure which of the exhibits he received and that some of the information in the exhibits "was provided to me by other means." Truell testified only that he did not "recall seeing" the exhibits. The court also found that because the exhibits contained only "suspicions, speculations, and rumors," George had failed to show any prejudice which could have resulted from any alleged nondisclosure.

Upon our review of the record, we conclude the district court's finding that the prosecution did not withhold material evidence favorable to George during *George I* or *George II* is not clearly erroneous. This assignment of error is without merit.

### Expert Witness

George asserts in his final assignment of error that the district court erred in overruling George's motion to appoint an expert witness concerning the reliability of eyewitness identification.

The denial of a motion to appoint an expert witness in a post-conviction action is reviewed for abuse of discretion. *State v. Gagliano*, 231 Neb. 911, 438 N.W.2d 783 (1989); *State v. Suggett*, 200 Neb. 693, 264 N.W.2d 876 (1978).

In *State v. Ammons*, 208 Neb. 812, 814-15, 305 N.W.2d 812, 814 (1981), we held that expert testimony on the reliability of eyewitness identifications was unnecessary, stating:

> The general rule is that expert testimony is admissible only if it will be of assistance to the jury in its deliberations and relates to an area not within the competency of ordinary citizens. If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, expert testimony may be admissible. . . . The accuracy or inaccuracy of eyewitness observation is a common experience of daily life. Such testimony would invade the province of the jury.

(Citations omitted.)

A review of this record discloses no circumstances which would distinguish this court's holding in *Ammons*. As such, the district court did not abuse its discretion in denying George's request for an expert witness. This assignment of error is without merit.

### CONCLUSION
The decision of the district court is affirmed.

AFFIRMED.