NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0443n.06

No. 13-5414

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Jun 12, 2015

DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| HOWARD WALTER THOMAS, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| STANTON HEIDLE, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE: GIBBONS and COOK, Circuit Judges; GWIN, District Judge.[*]

GIBBONS, J., delivered the opinion of the court in which COOK, J., joined in full, and GWIN, D.J., joined except for Part IV.C.

JULIA SMITH GIBBONS, Circuit Judge. Howard Walter Thomas appeals the district court's denial of his petition for a writ of habeas corpus seeking relief from his convictions in Tennessee for murder, attempted murder, robbery, and kidnapping. This court granted a certificate of appealability as to a single issue: whether the state court erred when it excluded the testimony of a defense expert who planned to testify to some of the potential flaws—and the scientific bases of the flaws—in an eyewitness's identification of Thomas as the perpetrator. In excluding the expert evidence, the trial court relied on then-existing state precedent—since overruled—that effectively made expert testimony on eyewitness identification *per se*

---

[*] The Honorable James S. Gwin, United States District Judge, United States District Court for the Northern District of Ohio, sitting by designation.

inadmissible. Thomas challenges the exclusion as a violation of his rights under the Due Process

Clause of the Fourteenth Amendment, and/or the Compulsory Process or Confrontation clauses

of the Sixth Amendment, pursuant to *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973), and its

progeny. We hold that the exclusion did not amount to a violation of clearly established federal

law. Even if it had, any error would have been harmless. We therefore affirm.

I.

John and Yvonne Cook were driving their van from Wisconsin to vacation in North

Carolina on the morning of March 23, 1991.[1] Yvonne was asleep on a bedroll in the back of the

van. She woke up when John pulled off the interstate in Knoxville, Tennessee. It was morning

and was raining heavily. Once the van was stationary, John turned on the map light and reached

for the atlas on the dashboard. Yvonne heard him say, "Oh my God," followed by an explosion

and a "pop." He slumped toward her in the seat and she noticed that he was bleeding heavily,

mostly from his ear.

The assailant broke the window and opened the driver-side door, causing the van's dome

lights to switch on. He began pushing John out of the driver's seat. Yvonne, sitting on the floor

almost between the two front seats, unlatched John's seatbelt. The assailant pushed John into

Yvonne's arms and took his place in the driver's seat. Yvonne had a "full facial view" of the

man as he got into the driver's seat. Now sitting mere inches from the front seat, she noticed that

the man had laid a gun across his lap with the barrel pointing at her head.

---

[1] Except where otherwise indicated, the facts presented here are those set forth by the Court of Criminal Appeals of Tennessee in *Thomas v. State*, 298 S.W.3d 610 (Tenn. Crim. App. 2009), which cross-refers to that court's previous decision in *State v. Thomas*, No. E2003-02090-CCA-R3-CD, 2005 WL 735040 (Tenn. Crim. App. Mar. 30, 2005). This court "accept[s] the state court's determination of a factual issue unless the petitioner upsets the presumption by clear and convincing evidence." *Jackson v. Bradshaw*, 681 F.3d 753, 759 (6th Cir. 2012). Thomas does not challenge the state court's factual findings in this appeal.

The man drove onto the interstate and drove speedily for fifteen to twenty minutes. He refused Yvonne's request to release them so that she could find medical help for John. By keeping pressure on John's neck, she hoped to keep him alive. Despite her efforts, she felt his heart stop beating after around ten minutes. When she again begged the assailant to stop, he said, "[D]on't look at me. I'm going to kill you, too." He exited the interstate onto a two-lane rural road before pulling over on the side of the road and demanding cash from Yvonne. She reached into her purse and retrieved an assortment of ten- and twenty-dollar bills from John's wallet, totaling somewhere between five hundred and a thousand dollars. She handed the money over to the assailant, her hands covered with her husband's blood.

The driver ordered Yvonne to exit the car. He got out of the driver's seat, walked around to the back of the van, and dumped John's then-lifeless body onto the ground. "It was beginning to get light" outside by this time. Yvonne stood up right next to the assailant. He ordered her not to look at him and to get down on her hands and knees. He tried to load his gun while pointing it at her head. He struggled to do so because he was wearing gloves. When Yvonne begged for her life, he told her, "I'm not going to rot in some fucking prison because you can identify me." At that time, another car came down the road, its lights shining on Yvonne. This caused the assailant to flee in the van.

She described these events to Knoxville Police Department (KPD) officers who soon arrived on the scene. Yvonne also tried to retrace the scene while riding with them. Later, at the police station, she gave a detailed description of the attacker. She said that he was very young, no older than twenty-two and perhaps younger than seventeen. She believed he was around five feet, five inches tall. He had a "bandanna-type cloth" over his head, down to his nose, and had

medium brown hair with around three inches hanging down at the back. Police found the van the same day but did not recover any fingerprints and did not locate a suspect.

After Yvonne returned home to Wisconsin, a psychiatrist suggested that she undergo hypnosis. She did so in order to "help do something to solve the case." She explained that the hypnosis put her in a state of "deep concentration and relaxation," but that it did not change her mental image of the assailant. After the hypnosis, a police sketch artist drew a composite of the suspect based on Yvonne's description. She concluded that the sketch did not "look exactly like the person," rating it seven out of ten for its likeness to the assailant, but "believed it was the best that we could do." During the year after John's death, she also viewed several photographic and video lineups, none of which contained Thomas's picture. She noted some similarities in appearance, but did not positively identify anyone.

In 2000, KPD officers interviewed a resident of Atlanta, Georgia, by the name of Mary Storm. She provided the names of two suspects in Knoxville: Howard Walter Thomas and Ernest Salyer. Officers spoke to Salyer and, based on his statement, arrested Thomas and charged him with felony-murder. In May 2000, the KPD told Yvonne they had arrested a suspect. A friend then sent her a report from a Knoxville newspaper of the arrest. Directly beneath a picture of John was a picture of Thomas as he appeared in 2000.

Thomas was indicted in Tennessee state court for first-degree premeditated murder, first-degree felony murder, especially aggravated robbery, especially aggravated kidnapping, and attempted first-degree murder. The state filed notice of intent to seek the death penalty.

Before trial, Thomas moved to suppress Yvonne's identification testimony on the bases that it was influenced by hypnosis and that it was the product of an overly suggestive identification. The court denied the motion after an evidentiary hearing but permitted an

interlocutory appeal.  But the Tennessee Court of Criminal Appeals denied the application for interlocutory appeal and the Tennessee Supreme Court declined to review the case.

Thomas also gave pre-trial notice of his intent to introduce testimony from Dr. Elizabeth Loftus, an expert in eyewitness identification.  After Loftus furnished a report and testified at a hearing, the court excluded her testimony, holding that it was inadmissible under Tennessee law. Specifically, then-existing state precedent—subsequently overruled—held that expert testimony on the subject of eyewitness identification was *per se* inadmissible under the state's rules of evidence.  The court denied Thomas's motion for reconsideration and refused permission to take an interlocutory appeal.

Thomas was tried in late April and early May 2003.  When asked to identify the assailant in the courtroom, Yvonne walked toward Thomas, without objection, said, "You're the person that murdered my husband," and pointed at him.  When asked if she had any reason to identify the wrong person, she replied, "Of course not."  She maintained that Thomas's picture in the newspaper report had no impact on her identification, which was based solely "on the incident." She noted that Thomas's hair "seem[ed] a little darker" at the time of trial than the assailant's was at the time of the crimes and that Thomas had facial hair at trial.  But she explained that these differences had no impact because "[t]he profile and the facial features are all the same." She also identified a picture of Thomas as he looked in 1990, around eight months before the incident, in which he had brown hair and no facial hair.  On cross examination, she acknowledged that another photograph—taken three weeks before the killing—also depicted Thomas, even though he then had black hair and facial hair.

Yvonne testified that, while in the van with the assailant, she focused largely on her husband and on the gun pointed in her direction.  Nonetheless, she maintained that she looked at

the person in the driver's seat because she had significant interaction with him while trying to convince him to stop the van. She mostly saw him in profile because of her position relative to his while he was driving. Although she had not seen any profile shots in the photo arrays, she had seen the profile of potential suspects in a video lineup. On that occasion, she identified "number four"—who was not Thomas—as having the same profile and body language as the assailant. Thinking he was a very strong possibility, she requested a sample of his voice but never received it.

Ernest Salyer testified that he and Thomas were "[b]est friends, like brothers," and that he had known Thomas since Ernest was fourteen or fifteen years old. Early in the morning of March 23, 1991, Thomas called him and asked for a ride from a car wash. When Ernest arrived, Thomas was wearing a bandana around his head. He had blood on his jacket and jeans and was carrying a rifle wrapped in a blanket or a sheet. According to Ernest, Thomas told him he had "killed somebody," and later elaborated, saying that "he [ran] across the interstate and shot in a vehicle, jumped in it and drove them to Norris Freeway." Once there, Thomas apparently said that he "got the woman out and he was going to shoot her and started reloading his gun and it got jammed and a car come and scared him and he took off." Ernest testified that they then returned to his mother's house, where his mother washed Thomas's bloodstained clothes, believing he had been in a fight. They next went to Ernest's grandmother's house, where they hid the rifle, a ".22 semi-automatic." On their return to his mother's house, Ernest testified that Thomas gave Ernest's sister, Sammie, a blood-stained twenty-dollar bill and told her to buy something for her son.

Joyce Salyer, Ernest's mother, also testified. She said that Thomas called her house early in the morning on March 23, 1991, asking for Ernest. When Ernest returned with Thomas, she

testified that she washed Thomas's clothes because they were stained with blood and that he said he had been in a fight. She also corroborated that Thomas gave Sammie a twenty-dollar bill that "had red on it" and "looked like blood." Joyce later became suspicious about the story she had been told. After she watched the news report on the murder and asked Ernest, he told her what Thomas had done. When she learned about the gun, she asked Ernest to retrieve it from her mother's house because her mother "didn't need to be involved in this." Joyce testified that she put Thomas's clothes in a plastic bag and gave them to her mother to burn.

Joyce's mother, Goldie Storm, testified that Ernest and Thomas went to her house with a .22 rifle at around 11:00 a.m. on March 23. She agreed to keep the gun, and it remained in a closet at her house until two days later, when the two men came back and removed it. She also testified that Joyce gave her Thomas's clothes and that she burned them with the garbage. Sammie testified that Thomas gave her a twenty-dollar bill with a red mark on it but said that she did not know what the mark was and did not see Thomas with an entire pile of bills.

Sandy Buckner, the defendant's friend, testified that she was working at a twenty-four-hour convenience store on the morning of March 23. Thomas came into the store early in the morning and, at around 5:00 a.m., she gave him a ride home. She remembered that he was wearing boots, blue jeans, and a leather jacket, and that he had a bandana in his pocket or on his head. When he returned to the store a few days later, Buckner noticed that he was dressed differently than usual and that his hair was now black. He told her that he had changed his hair color because he was "afraid that he would . . . look like the guy in the newspaper."

Loretta Strange also testified. Strange was dating Thomas in March 1993. Between that time and the time of trial, however, she married and divorced Ernest Salyer. Strange said that she and Thomas were watching television around two weeks after the crimes and that Thomas

said, "I'm glad there's not cops like [those on the television] here [or] I'd already be arrested."

Asked to explain, he apparently said, "The guy on the interstate, I did that, and if there were cops

like that here, I'd already be arrested." Later in 1991, she and Thomas were walking in the

woods and—when they reached a freeway exit close to Thomas's house—he said, "This is where

I killed that guy . . . . [T]his is where I did it. I sat up here. I shot at cars, and I hit somebody."

On another occasion, he said that he "accidentally" hit somebody while shooting at cars. Strange

asked what happened after he shot the person. According to her testimony, Thomas then

explained:

> He got in the van. He made the woman hold her husband as he drove her around.
> I don't know exactly where he drove her to. He'd had a conversation with her
> saying that he was going to have to kill her because he wasn't going to prison and
> that she was the only witness. He was actually going to kill her. He had her
> outside of a van fixing to shoot her. A car came along; scared him. He got in the
> van and left.

He threatened to kill Strange if she ever told anyone. When Thomas first told her about

the crimes, she thought he was "just talking to be talking," given his tendency to exaggerate and

"[t]alk tough." She also noticed that Thomas would only talk about the incident when he was

drunk. She later came to believe him, however, "after he showed me the trail and it was

something that he had said on more than one occasion." Strange's testimony about how she

learned of the killing conflicted with her earlier account: when she initially spoke to the police,

she claimed that she was at Joyce's house when Thomas called and asked Salyer to pick him up

at the car wash.

Strange also testified that, shortly after March 23, Thomas said that his "black denim

jacket" with "beads and leather patches on it" had "gone." He also dyed his hair black, "so that

it looked blue in the light." Before March, she explained, he had "cut his hair and became kind

of clean cut looking for a little while."

By stipulation, the court admitted the testimony of Dr. Francis Jones, a retired pathologist who performed John Cook's autopsy. He concluded that the cause of death was "two small caliber-.22 gunshot wounds to the head." The state also elicited testimony from four witnesses who had been involved in the investigation as officers with the KPD and the Knox County Sheriff's Department.

After the state rested, Thomas elected not to put on any evidence. The jury acquitted Thomas on the felony murder count and returned guilty verdicts as to all other charges. Based on Yvonne's wishes, the state withdrew its notice of intent to seek the death penalty. At a separate sentencing hearing, the court sentenced Thomas to life in prison for premeditated murder, twenty-two years for especially aggravated robbery, and twenty-two years for especially aggravated kidnapping, all to be served concurrently with the life sentence. The court also sentenced Thomas to twenty-five years for attempted first-degree murder, to be served consecutively to the other sentences.

On direct appeal, the Tennessee Court of Criminal Appeals affirmed Thomas's convictions but reduced his sentences for attempted first-degree murder, especially aggravated robbery, and especially aggravated kidnapping. *State v. Thomas*, No. E2003-02090-CCA-R3-CD, 2005 WL 735040, at *1 (Tenn. Crim. App. Mar. 30 2005). The Tennessee Supreme Court denied permission to appeal. The United States Supreme Court denied Thomas's petition for certiorari. *Thomas v. Tennessee*, 126 S. Ct. 1475 (2006). Thomas next sought state post-conviction relief. The trial court denied the petition, the Tennessee Court of Criminal Appeals affirmed the denial, and the Tennessee Supreme Court denied permission to appeal.

Thomas's writ of habeas corpus followed, seeking relief on multiple grounds. The district court denied the petition and also denied a certificate of appealability. *Thomas v.*

*Carlton*, No. 3:10-cv-22, 2013 WL 1249601, at \*20 (E.D. Tenn. Mar. 26, 2013). Thomas filed a notice of appeal and requested a certificate of appealability from this court. This court granted the application "as to [Thomas's] claim that his rights were violated by a *per se* rule barring expert proof on the unreliability of eyewitness identification."

## II.

The single question at issue in this case is whether Thomas is entitled to habeas relief based on the state court's *per se* rule barring expert testimony on the unreliability of eyewitness identification. The answer must begin with a detailed review of the rule at issue and its application in Thomas's case.

Rule 702 of the Tennessee Rules of Evidence provides: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." In *State v. Coley*, 32 S.W.3d 831 (Tenn. 2000), a 3-2 majority of the Tennessee Supreme Court read Rule 702 as essentially precluding expert testimony on the reliability of eyewitness identification. The majority concluded that "[e]yewitness testimony has no scientific or technical underpinnings which would be outside the common understanding of the jury; therefore, expert testimony is not necessary to help jurors 'understand' the eyewitness's testimony." *Id.* at 833–34. The court also noted that a defendant can adequately test an eyewitness's memory with cross-examination, that jury instructions can guide the jury in its consideration of credibility, and that the proposed expert testimony could confuse or mislead the jury or cause the jury to abandon its role as the finder of fact. *Id.* at 836–37. Thus, the court held that "general and unparticularized expert testimony concerning the reliability of eyewitness testimony, which is not specific to the witness

whose testimony is in question, does not substantially assist the trier of fact." *Id.* at 838. The type of "general and unparticularized testimony" at issue in *Coley* was similar to the type of evidence that Thomas sought to admit through his expert, Loftus. The expert in *Coley* planned to discuss:

> 1. the process of eyewitness identification; 2. the relationship between stress and memory of an event; 3. cross-racial identification; 4. the confidence the witnesses have in the accuracy of their identifications and the actual accuracy of their identifications; 5. the effect of time on the accuracy of memory; and 6. the suggestibility of the photographic line-up used in this case.

*Id.* at 833. In the present case, Loftus explained that her scientific expertise did not enable her to opine on "whether [Yvonne Cook's identification] is accurate or not." Nonetheless, she planned to apply the general principles from the field to the specific circumstances of the case. She reviewed police reports, Yvonne's interview from the day of the killing, the composite sketch of the assailant, and the newspaper article that Yvonne saw soon after Thomas's arrest. She identified "factors present in the current case that are known to create problems for accurate eyewitness testimony." These included extreme stress and fright, "weapon focus," an "extraordinarily long retention interval," and identification based on a "highly suggestive newspaper article." Loftus stated that hypnosis can increase a witness's confidence. She further explained that confidence is malleable—meaning it is influenced by suggestive information— and is "only weakly related to accuracy." She explained, moreover, that "[m]any of the factors" she planned to discuss "are not clearly understood by jurors, and some are even in conflict with misconceptions that jurors have about the workings of memory." Although she could not comment specifically on the accuracy of the identification in the case, she could "correct some of the misperceptions" some jurors have about memory, giving the jury a scientific basis to "make its own decision."

After the evidentiary hearing, the trial court found as follows:

> The proffered testimony of Dr. Loftus is remarkably similar to the testimony considered in the *Coley* case. Specifically, Dr. Loftus' opinion included information regarding the process of identification, the relationship of stress to memory, the difference between confidence in identification and actual accuracy of identification, the effect of passage of time on the identification and the suggestibility of photograph[s] presented to the witness in this case. The only significant difference between the testimony proffered in this case and that of *Coley* is that there is no cross-racial consideration presented in this case. The court did not find anything in Dr. Loftus' testimony to be of a more specific nature than that addressed in *Coley*. Therefore, the court finds that the evidence is per se inadmissible.

The Tennessee Court of Criminal Appeals rejected Thomas's claim that the exclusion of Loftus's testimony violated his due-process rights. In particular, the court held that the proposed testimony was not critical to his defense. *Thomas*, 2005 WL 735040, at *25. We consider below whether that state-court decision entitles Thomas to habeas relief.

The language of both the *Coley* court and the trial court in Thomas's case suggests, perhaps, that there would be room for expert testimony on eyewitness identification in some circumstances, provided it is not "general and unparticularized." *See Coley*, 32 S.W.3d at 838. In practice, however, the rule has functioned as a flat bar on expert testimony in this area. Indeed, in a subsequent case, the Tennessee Supreme Court characterized the holding of *Coley* as establishing a rule that "no one, regardless of credentials or experience and no matter how questionable the evidence, can provide testimony on the issue of eyewitness identification." *State v. Copeland*, 226 S.W.3d 287, 300–01 (Tenn. 2007).

But four years after Thomas's trial, the Tennessee Supreme Court reversed course, explicitly overruling *Coley* in its unanimous opinion in *Copeland*, 226 S.W.3d 287. It acknowledged "the educational training of the experts and the empirical science behind the reliability of eyewitness testimony." *Id.* at 299. The court also recognized "that neither cross-

examination nor jury instructions on the issue are sufficient to educate the jury on the problems with eyewitness identification." *Id.* at 300. Rather than maintaining the *per se* exclusion, the court gave trial courts discretion to assess the reliability of eyewitness-identification testimony as they would assess any other expert evidence under Rule 702. *Id.* at 300 (citing *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997)). Tennessee courts now admit expert testimony on eyewitness identification if it appears that the expert's opinion is "based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation." *Id.* at 301 (quoting *McDaniel*, 955 S.W.2d at 265).

## III.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that a federal court may not grant a writ of habeas corpus after a state court has adjudicated the case on the merits unless the state court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision is "contrary to" clearly established law if "the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if "the state court confronts a set of facts that are materially indistinguishable" from a Supreme Court decision and nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). An "unreasonable application" of clearly established federal law occurs "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the [petitioner's] case." *Id.* at 413.

"Even a general standard may be applied in an unreasonable manner." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). A federal court need not therefore "'wait for some nearly identical factual pattern before a legal rule must be applied.'" *Id.* (quoting *Carey v. Musladin*, 549 U.S. 70, 81 (2006) (Kennedy, J., concurring in judgment)). Rather, a federal court may hold that a general principle was applied unreasonably on facts "'different from those of the case in which the principle announced.'" *Id.* (quoting *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)). But habeas relief may only be granted "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). "Put another way, 'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Abby v. Howe*, 742 F.3d 221, 226 (6th Cir. 2014) (quoting *Harrington*, 131 S. Ct. at 786–87).

When reviewing the district court's denial of a habeas petition, this court reviews the district court's legal conclusions *de novo* and its factual findings for clear error. *Jackson v. Bradshaw*, 681 F.3d 753, 759 (6th Cir. 2012).

IV.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations omitted) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). The Supreme Court recognizes that "[f]ew rights are

more fundamental than that of an accused to present witnesses in his own defense." *Taylor v. Illinois*, 484 U.S. 400, 408 (1988) (citing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).

But even this fundamental interest may "'bow to accommodate other legitimate interests in the criminal trial process.'" *Rock v. Arkansas*, 483 U.S. 44, 55 (1987) (quoting *Chambers*, 410 U.S. at 295)). The Constitution allows states "broad latitude" to implement rules excluding evidence from criminal trials. *United States v. Scheffer*, 523 U.S. 303, 308 (1998). These rules only violate a defendant's right to present a defense if they are "arbitrary" or "disproportionate to the purposes they are designed to serve." *Rock*, 484 U.S. at 56. The Supreme Court has held that the exclusion of evidence is arbitrary or disproportionate "only where it has infringed upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308 (citing *Rock*, 484 U.S. at 58; *Chambers*, 410 U.S. at 302; *Washington v. Texas*, 388 U.S. 14, 22–23 (1967)). Even if the exclusion of evidence has infringed upon a weighty interest of the accused in an arbitrary or disproportionate manner, the consequent constitutional error must be reviewed for harmlessness pursuant to *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Ferensic v. Birkett*, 501 F.3d 469, 472 (6th Cir. 2007).

This case therefore presents three sub-issues. First, did the exclusion of the expert testimony on eyewitness identification infringe upon Thomas's weighty interest based on clearly established Supreme Court law? Second, if so, did it do so in a way that was—again according to clearly established law—arbitrary or disproportionate to the purpose the exclusion was designed to serve? Finally, if it did, was the error harmless?

A.

We have previously held, applying clearly established law announced by the Supreme Court, that a criminal defendant has a "weighty" interest in having an expert on eyewitness

identification testify in a case in which the prosecution relied on eyewitness evidence. *See Ferensic*, 501 F.3d at 478 (citing *Scheffer*, 523 U.S. at 308). The clearly established law to be considered under AEDPA only extends to law that the Supreme Court—not this court—has announced. 28 U.S.C. § 2254(d); *see also Renico v. Lett*, 559 U.S. 766, 778–79 (2010); *Carey v. Musladin*, 549 U.S. 70, 72–78 (2006); *Coles v. Smith*, 577 F. App'x 502, 507–08 (6th Cir. 2014) (discussing the impact of *Renico*). But we are bound by our prior precedents when they have determined—based on Supreme Court case law—that a particular law is clearly established. *Smith v. Stegall*, 385 F.3d 993, 998 (6th Cir. 2004) ("We are . . . bound by any prior Sixth Circuit decisions concluding that federal law on a particular issue has been 'clearly established' by certain holdings of the Supreme Court."). Here, we are bound by the *Ferensic* court's determination that the relevant interest was weighty because, as we will explain, that case and the present case involve the same material circumstances and the same clearly established Supreme Court law.

In *Ferensic*, the state trial court ruled that the defense expert on eyewitness identification could testify provided the defendant furnished a copy of the expert's report to the state at least two months before trial. *Id.* at 471. But the defendant turned over the report only eleven days before trial. *Id.* The trial court excluded the expert evidence because it was too late for the prosecution to retain its own expert in the field without delaying trial. *Id.* This court affirmed the district court's grant of habeas relief. *Id.* at 484. It reasoned that the exclusion of the expert testimony—an exclusion that infringed the defendant's weighty interest—was both arbitrary and disproportionate because lesser sanctions were available and the government was not prejudiced by the late production of the expert report. *See id.* at 478. Finally, the court held that the state court's error—in light of all the circumstances of the case—was not harmless. *See id.* at 480–84.

Two aspects of the *Forensic* court's analysis can be distinguished from the present case. First, the fact that the exclusion in *Forensic* was arbitrary and disproportionate has little bearing on whether the exclusion of Loftus's testimony was either arbitrary or disproportionate. The trial court in *Forensic* excluded the evidence based on a mere discovery violation, while Loftus's testimony was excluded for evidentiary reasons. Second, the harmless-error review in *Forensic* necessarily surveyed all of the other evidence presented in that case. The present case requires a similarly fact-intensive inquiry.

Despite these differences, *Forensic* binds this court as to the importance of the accused's interest because Thomas's interest in having Loftus testify at trial was materially indistinguishable from the defendant's interest in having his expert testify in *Forensic*.[2] The identity of the perpetrator was the central issue in both trials, *see id.* at 471, the prosecution in both trials relied upon an eyewitness, *see id.* at 470, and both defendants sought the admission of expert testimony on the impact of relevant, case-specific factors on an eyewitness's recollection, *see id.* at 471–72.

The *Forensic* court held that the petitioner had a weighty interest in introducing expert testimony on eyewitness identification within the meaning of clearly established law as determined by the Supreme Court. *Id.* at 478. The *Forensic* panel explained: "[E]yewitness misidentification accounts for more false convictions in the United States than any other factor." *Id.* The court also reasoned that "the current near-universal acceptance of the reliability of expert testimony regarding eyewitness identification" distinguishes the *per se* exclusion of this testimony from the *per se* exclusion of polygraph evidence that the Supreme Court upheld in

---

[2] The *Forensic* court explicitly limited its holding "to the situation here where the record reflects the doubts of the jury itself as to the identification of the perpetrator." 501 F.3d at 484. But this appears to limit the holding only as it applies to the harmless-error analysis because the jury's doubts are relevant to prejudice but not to the weight of the defendant's interest. Also, the court explained that it was limiting its holding in order to preserve consistency with other holdings that were germane only as to harmlessness. *See id.* at 483–84.

*Scheffer*. *Id.* (citing *Scheffer*, 523 U.S. at 309). These factors made the admission of the expert testimony a matter of fundamental importance to the defendant. *Id.*

Given Thomas's weighty interest in the presentation of Loftus's testimony, we must next consider whether the exclusion of that testimony was arbitrary and disproportionate in a constitutional sense.

B.

The Supreme Court has made clear that, even when a state's evidentiary rules impinge on a defendant's weighty interest, those rules are unconstitutional only if—in the specific circumstances of the case—they are "arbitrary" or "disproportionate to the purposes they are designed to serve." *Rock*, 483 U.S. at 56; *see also Michigan v. Lucas*, 500 U.S. 145, 151 (1991). In considering whether the exclusion was arbitrary or disproportionate, the Court has considered the potential prejudice that the State and the adversary system would suffer if the evidence were admitted. *See Taylor v. Illinois*, 484 U.S. 400, 410–15 (1988).

Here, the exclusion was not arbitrary or disproportionate in a constitutional sense, let alone a violation or unreasonable application of *clearly established* constitutional law. It was not arbitrary or disproportionate for the court to reach the conclusion that testimony like Loftus's would not "substantially assist the trier of fact." *See* Tenn. R. Evid. 702. Though the Tennessee courts later reversed course on admitting expert evidence on eyewitness identification, this does not mean that the trial court's exclusion of Loftus's testimony was arbitrary or disproportionate to the interests it was designed to serve. It was within the province of the trial court to determine that admitting the evidence was likely to cause juror confusion, encroach upon the jury's role of

determining witness credibility, and lend no significant help to the jury. We therefore hold that there was no constitutional violation.[3]

Even if Thomas could show a potential violation—the kind of constitutional error that we could correct on direct appeal—this would not be sufficient to obtain relief under AEDPA because there is no violation of, or unreasonable application of, clearly established law as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d). The Supreme Court has not directly spoken on the law applicable to the circumstances of this case. And we can grant relief only if we conclude that the exclusion of Loftus's testimony in this particular case was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786–87. Present-day case law demonstrates that fair-minded jurists still disagree on the exclusion of expert testimony on eyewitness identification, even when it is effectively excluded on a blanket basis. The Eleventh Circuit has "'consistently looked unfavorably on' expert testimony about eyewitness reliability and held that 'a district court does not abuse its discretion when it excludes expert testimony on eyewitness identification.'" *United States v. Owens*, 445 F. App'x 209, 216 (11th Cir. 2011) (per curiam) (quoting *United States v. Smith*, 122 F.3d 1355, 1357, 1359 (11th Cir. 1997)). Though that decision is based on the Federal Rules of Evidence rather than the Constitution, it would be inconsistent for the Eleventh Circuit to sustain its position on direct appeal while also viewing a *per se* exclusion rule as unconstitutional. Similarly, many states— including several that maintain *per se* exclusions—would resolve the question the same way today, suggesting that the Supreme Court's precedents have not led all fairminded jurists to adopt Thomas's preferred view. *See, e.g.*, *State v. Young*, 35 So. 3d 1042, 1046–50 (La. 2010);

---

[3] We reached the same conclusion in *Buell v. Mitchell*, 274 F.3d 337, 359 (6th Cir. 2001), and *Moore v. Tate*, 882 F.2d 1107, 1110 (6th Cir. 1989) (per curiam).

*State v. George*, 645 N.W.2d 777, 790 (Neb. 2002); *State v. Goldsby*, 650 P.2d 952, 954 (Or. Ct. App. 1982). *See generally* George Vallas, *A Survey of Federal and State Standards for the Admission of Expert Testimony on the Reliability of Eyewitnesses*, 39 Am. J. Crim. L. 97, app. B (2011) (summarizing the various ways in which state courts address the admission of expert testimony on eyewitness identification). The retention of this position by fairminded jurists is instructive. And while we are not bound to follow this position, the Supreme Court has not announced any clearly established law that would license us to grant habeas relief here even if we detected the kind of error that would merit reversal on direct appeal.

There was no violation of, or unreasonable application of, clearly established law as determined by the Supreme Court. AEDPA relief is unwarranted.

C.

Finally, even if we were convinced that Thomas's clearly established rights had been violated, Thomas would not be entitled to relief because the claimed error was harmless.[4] A constitutional error is not harmless for the purposes of habeas review if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). To resolve this issue, the court should not use a mere sufficiency inquiry. *See Ferensic*, 501 F.3d at 483 (citing *Kotteakos*, 328 U.S. at 765). Rather, the relevant question is "'Do I, the judge, think that the error substantially influenced the jury's decision?'" *Id.* at 481 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436–37 (1995)). If a judge has "grave doubt" about the potentially substantial and injurious effect of the

---

[4] Thomas argues that the warden waived her harmless-error argument by failing to raise it before the district court. We disagree. The warden argued in this district court that "a wealth of other evidence independent of the [eyewitness] victim was presented to establish the petitioner's identity as the perpetrator of this offense." Even if we believed this was insufficient to preserve the argument, we would still exercise our discretion to reach the issue because it is plainly apparent from the record that the error almost certainly had no substantial influence on the outcome. *See Gover v. Perry*, 698 F.3d 295, 300 (6th Cir. 2012) (discussing the factors that we consider in deciding whether to exercise our discretion and reach a harmless-error issue that has been waived).

error, the error is not harmless "[a]nd the petitioner must win." *O'Neal*, 513 at 436. In other words, "[u]ncertainty in answering this question . . . militates in favor of the habeas petitioner." *Forensic*, 501 F.3d at 481.

Even if we believed that the state trial court's exclusion of Loftus's testimony was erroneous, we would not be left with grave doubt. Assuming that the trial court had permitted Loftus to testify—and even assuming further that her testimony had led the jury to believe that deficiencies existed in Yvonne's testimony—a substantial volume of additional evidence still indicated Thomas's guilt. Ernest Salyer admitted helping Thomas hide the gun. Joyce Salyer and Goldie Storm corroborated his account. Joyce further testified that she washed blood from Thomas's clothes on the morning of March 23. There was evidence that Thomas gave Sammie Salyer cash with red marks on it. According to Ernest, Thomas admitted that he "killed somebody," and gave further information about the crime. Loretta Strange also recounted first-hand details that Thomas told her about John Cook's murder. In its closing argument, the prosecution relied heavily on this entire web of incriminating evidence. It pointed to the eyewitness identification as just one of several pieces of strong, materially consistent evidence indicating Thomas's guilt.

Thomas argues that we should have grave doubt in this case, just as the *Forensic* panel's grave doubt led it to grant the petitioner relief. But *Forensic* is plainly distinguishable. There, "[t]he entirety of the evidence against [the defendant] was based upon eyewitness identifications made by the victimized couple." *Id.* at 470; *see also id.* at 481–84 (applying the harmless-error test). The court also placed great weight on the fact that a note from the jury to the trial judge during deliberations indicated that the jury had doubts about the strength of the case against the defendant and, in particular, questioned evidence related to the eyewitness identification. *Id.* at

483–84. Indeed, the panel explicitly limited its holding "to the situation here where the record reflects the doubts of the jury itself as to the identification of the perpetrator." *Id.* at 484.

Here, viewing all of the evidence together, we do not believe that the exclusion of the expert testimony had a substantial and injurious effect on the jury's verdict. We therefore believe that the exclusion was harmless and would not merit relief even if we believed it was erroneous.

V.

For the foregoing reasons, we affirm the district court's denial of habeas relief.